# In the United States Court of Federal Claims

**OFFICE OF SPECIAL MASTERS**
**No. 22-0280V**

|  |  |
|---|---|
| MANDY WHITE,<br><br>                Petitioner,<br><br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>                Respondent. | Chief Special Master Corcoran<br><br><br><br>Filed: February 10, 2026 |

*Laura Levenberg, Muller Brazil, Dresher, PA, for Petitioner.*

*Madelyn Weeks, U.S. Department of Justice, Washington, DC, for Respondent.*

## RULING ON ENTITLEMENT[1]

On March 11, 2022, Mandy White filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges that she suffered a shoulder injury related to vaccine administration ("SIRVA") as a result of an influenza ("flu") vaccine she received on November 17, 2020. Petition at 1. The case was assigned to the Special Processing Unit of the Office of Special Masters.

Because the parties could not informally resolve the issue of entitlement, Petitioner filed a Motion for Ruling on the Record. I find that Petitioner is entitled to compensation.

---

[1] Because this Ruling/Decision contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Ruling/Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

## I.       Procedural History

After Petitioner filed her claim, she filed 24 exhibits consisting of primary care records (pre-vaccination and post-vaccination), the vaccine administration record, affidavits, orthopedic records, and physical therapy records. ECF No. 1-22.

On October 26, 2023, Respondent filed a Rule 4(c) Report recommending that Petitioner's claim be denied due to Petitioner not meeting the Vaccine Act's severity requirement. He also maintained that required elements for a Table SIRVA claim were unmet - Petitioner could not prove by preponderant evidence that her shoulder pain began within 48 hours of her flu vaccination, that she suffered reduced range of motion ("ROM"), and that there was no other condition or abnormality that would explain her symptoms. *Id*. at 15, 16, 18. On March 29, 2024, a scheduling order was issued instructing Petitioner to brief entitlement. Petitioner then filed a Motion for Ruling on the Record ("Mot.") on May 28, 2024. ECF No. 28. Respondent filed a Response on August 29, 2024 "(Resp."). Petitioner filed a Reply on September 18, 2024 ("Reply"). This matter is now ripe for adjudication.

## II.      Relevant Medical History

A complete recitation of the facts can be found in the medical records, the Petition, declarations and affidavits, and in the parties' respective briefings. In summary, Ms. White was 38 years old when she received the flu vaccine in her left deltoid on November 17, 2020, at Milford Memorial Hospital. Ex. 1 at 2. She had a lengthy and complicated medical history that included, among other conditions, epilepsy, chronic pain disorder, and several mental health disorders. Ex. 2 at 1-92; Ex. 3 at 109-123; Ex. 4 at 60-151.

On November 19, 2020, Ms. White had a telemedicine visit with her primary care provider ("PCP"), Robin Horton, FNP ("FNP Horton"), of Milford Medical Clinic, to follow up on her lab results. Ex. 22 at 28. Petitioner did not report left arm or shoulder pain during this visit. *Id*. Over the next month, Ms. White had multiple telemedicine visits with FNP Horton, as well as Alan Smith, M.D., a family medicine practitioner at Revere Health, for a variety of issues, but she made no report of shoulder pain. *See* Ex. 4 at 68, 72; Ex. 22 at 31-34; Ex. 4 at 63.

On December 16, 2020 (now 30 days post-vaccination), Ms. White had a telemedicine visit with FNP Horton. Ex. 11 at 4. Petitioner reported increasing pain in her left shoulder and difficulty raising her arm above shoulder height. *Id*. Ms. White noted that she had an "old rotator cuff tear, but it was minor and there [had] not [been] surgical intervention." *Id*. FNP Horton prescribed a Medrol Dosepak and instructed Ms. White to follow up in seven to 10 days if her pain did not subside. *Id*. at 5.

2

Ms. White had several medical appointments in December 2020 for unrelated care, and there is no mention of left shoulder pain in these records. *See* Ex. 13 at 37 (Dec. 21, 2020, home PT visit for chronic pain and balance issues); Ex. 4 at 59 (Dec. 23, 2020, saw Dr. Smith for PTSD); Ex. 3 at 11 (Dec. 28, 2020, saw FNP Horton for a new nebulizer and testing for porphyria).

On January 11, 2021, Ms. White had a telemedicine visit with Dr. Smith for complaints of left shoulder pain, lower back pain, cervical spine pain, a deviated septum, worries about COVID-19 risks, depression, and bipolar disorder. Ex. 4 at 54. Petitioner reported that her left shoulder pain was worse "[w]hen she [was] not on her oxygen." *Id*. She denied that this pain was associated with an injury, but rather was "worried about this being from cardiac disease." *Id*.

That same day, Ms. White attended a telemedicine visit with her neurologist, Alan Sanderson, M.D., for her history of reported idiopathic epilepsy. Ex. 5 at 209. Dr. Sanderson noted that Petitioner was taking levetiracetam for her seizures, but "[s]ince her last visit she [said that] she [thought] she ha[d] had a few seizures. She hurt her shoulder and [could not] remember how, so her assumption [was] that it happened during a seizure." *Id*.

On January 15, 2021, Ms. White had a telemedicine visit with FNP Horton. Ex. 3 at 18. She had questions about receiving the COVID-19 vaccine after receiving the flu vaccine. *Id*. FNP Horton advised, "[H]aving the flu vaccine over 5 months [sic] ago will not affect her getting the covid vaccine." *Id*. at 19.

Over the next month, Ms. White had several telemedicine visits for various issues unrelated to her shoulder. *See* Ex. 4 at 50 (Jan. 18, 2021, Dr. Smith, irritable bowel syndrome); *id*. at 46 (Jan. 26, 2021, Dr. Smith, porphyria); Ex. 3 at 21 (Feb. 3, 2021, Lance Smith, M.D., shortness of breath, cough, headache, and a mild sore throat); *id*. at 25 (Feb. 9, 2021, FNP Horton, home health services and abdominal pain); *id*. at 28 (Feb. 16, 2021, FNP Horton, lump above her left ankle).

Ms. White's first reference to her shoulder pain being associated with vaccination was on February 17, 2021 - three months post-vaccination - during a telemedicine visit with her neurologist, Dr. Alan Sanderson. Ex. 5 at 178. Dr. Sanderson took the following history:

> She has some lingering complaints in her left arm and shoulder since having a flu shot in November. She says that when the shot was given to her she had a seizure-like episode with shaking all over her body, but retained awareness. She has burning pain in the left shoulder and initially lost her

3

range of motion. This has returned with physical therapy. If she lays on that spot she says she loses feeling. She also wonders whether she has blood clots, and whether this could be related to the flu shot as well. She would like to have a nerve test to examine the left arm.

*Id*. Dr. Sanderson diagnosed Petitioner with left shoulder pain and ordered an EMG. *Id*.

On March 10, 2021, Ms. White saw FNP Horton via telemedicine for a follow-up from an ER visit the previous Sunday night for stomach pains. Ex. 3 at 40. Petitioner reported that her "right [sic] shoulder continues to ache and feels like a block." *Id*. Ms. White reported that she was able to use her arm and did not have limitations in her range of motion. *Id*. She blamed her symptoms on her "flu vaccine from last year." *Id*. FNP Horton diagnosed Petitioner with shoulder pain, but no treatment was listed. *Id*. at 41-42.

On March 23, 2021, Ms. White had a telemedicine visit with FNP Horton to "talk about her circulation" and for left shoulder pain. Ex. 3 at 53. Petitioner reported "decreasing the blood flow in her left arm" and that "the home health nurse could not get blood to draw until the torniquet was removed." *Id*. Ms. White stated that she wanted "something done about her shoulder as it ha[d] hurt ever since getting [the] flu vaccine 6 months [sic] ago." *Id*. She reported that "the needle hit a nerve upon administration of [the] vaccine." *Id*. FNP Horton recommended that Ms. White go to the hospital to have her left shoulder x-rayed. *Id*. at 55.

Two days later, on March 25, 2021, Ms. White had an in-person visit with FNP Horton for complaints of "severe left shoulder pain that [had] affect[ed] her activities of daily living since her flu shot in November" and to follow up on the result of her x-rays. Ex. 3 at 57. Petitioner described moderate to severe pain that sometimes radiated down her left arm. *Id*. She reported that "nothing fully relieved the pain" and she "[couldn't] live with it anymore." *Id*. Upon examination, Ms. White had point tenderness over her left deltoid but full range of motion in her left shoulder. *Id*. at 60. FNP Horton ordered home health physical therapy ("PT") for treatment of Petitioner's left shoulder. *Id*. If there was no relief from PT, then FNP Horton planned a referral to an orthopedist. *Id*.

On April 5, 2021, Ms. White had her first home PT visit for treatment of left shoulder pain. Ex. 13 at 13. The physical therapist noted that Petitioner had pain and muscle weakness with left shoulder abduction. *Id*. at 14. Ms. White had additional PT sessions for her left shoulder on April 19 and 26, 2021, before being discharged with a home exercise program as she could perform her daily activities without assistance and understood her home exercise program. *Id*. at 5, 24.

On April 14, 2021, Ms. White underwent a left arm EMG/NCS, and it revealed "mildly reduced left median motor amplitude," although the findings were deemed nonspecific. Ex. 5 at 147. At the time of her EMG, Petitioner stated she had pain in her left shoulder "since having a flu shot some months ago." *Id.*

On April 28, 2021, Ms. White saw orthopedic surgeon Randy Delcore, M.D., at Cedar Orthopedic Surgery Specialty Clinic, with a chief complaint of left shoulder pain. Ex. 6 at 10. Petitioner provided the following history:

> She did undergo a flu shot in November and has had pain and issues ever since. She states that [at] the time of the shot, she was given an injection into the posterior shoulder/arm area and was told by the person who did this at the Milford Medical Clinic told her he had a "hard time getting the needle in" and had to do a few injections. She stated that she had increased pain immediately after and the arm started moving on it's [sic] own and she felt like there was some nerve issue as well. She also states that it took over an hour for them to get her arm to stop bleeding.

*Id.* Upon exam, Ms. White had tenderness to palpation over the humerus and positive Hawkins and Neer's tests but 5/5 strength with forward flexion, abduction, external rotation, and internal rotation. *Id.* at 10-11. Dr. Delcore's assessment was left shoulder pain. *Id.* at 11. Dr. Delcore stated that Ms. White could have impingement syndrome and suggested a shoulder MRI. *Id.*

On May 7, 2021, Ms. White saw FNP Horton for right hip and left shoulder pain. Ex. 3 at 90. Petitioner reported that she was using rubber tubing to exercise her shoulder, and stated that the pain was slowly improving. *Id.* Upon exam, Ms. White demonstrated full range of motion in her left shoulder. *Id.* at 91. FNP Horton advised Petitioner to see a chiropractor for a sacroiliac joint adjustment and to continue exercising her left shoulder at home. *Id.* at 92.

On June 9, 2021, Ms. White saw Jonathan Romney, NMD, a chiropractor at Red Mountain Integrative Medicine & Pain Center. Ex. 10 at 2. On the Patient Intake Form, Petitioner listed her primary concerns as hypoparathyroidism, "MS/brittle bones," epilepsy, and depression. *Id.* at 3. Petitioner indicated on a diagram that she had pain in her right (opposite) shoulder, abdomen, and lower back. *Id.* at 8.

Between June 11, 2021, and September 8, 2021, Ms. White attended 14 unrelated medical appointments, and no shoulder pain was reported at any of these visits. *See* Resp. Rpt. at 9.

On December 6, 2021, Ms. White returned to Dr. Delcore, more than seven months since her last visit, for complaints of "pain and stiffness in the neck for many years." Ex. 6 at 7. Dr. Delcore diagnosed Petitioner with cervicalgia and ordered a cervical spine CT. *Id*. Ms. White returned to Dr. Delcore on December 29, 2021, to discuss the results of her cervical spine CT, which showed cervical fusion syndrome (Klippel-Feil syndrome), a condition she was most likely born with. *Id*. at 5, 12.

On January 24, 2022, Ms. White saw Dr. Delcore to follow up on her complaints of left shoulder pain. Ex. 6 at 3. Ms. White reported that she had "the flu vaccine in November of 2018 [sic] and state[d] that she has had pain since this injection." *Id*. Petitioner described pain "that is a constant ache and increased with reaching, lifting, full ROM, etc." *Id*. Upon exam, Ms. White had tenderness to palpation over her left acromioclavicular joint and positive Hawkins and Neer's tests. *Id*. She "declined [a] left shoulder ROM exam secondary to pain." *Id*. Dr. Delcore diagnosed left shoulder impingement syndrome and recommended PT. *Id*. at 4.

On February 4, 2022, Ms. White had a telemedicine visit with Codie Bingham, APRN, at Advanced Pulmonary Sleep Disorders & Internal Medicine, for dyspnea on exertion, asthma, and obstructive sleep apnea. Ex. 15 at 20. Petitioner reported a seven-to-ten-day history of *right* arm pain and swelling. *Id*. at 23. Ms. White denied any injury associated with this pain but stated that her PCP suspected a possible thrombosis. *Id*. APRN Bingham advised Ms. White to follow up with her PCP. *Id*.

Ms. White had a telemedicine visit with APRN Bingham on February 24, 2022, for dyspnea on exertion, asthma, and obstructive sleep apnea. Ex. 15 at 24. She reported that she had an ultrasound on her right arm which revealed a torn rotator cuff. *Id*. at 39. Ms. White continued to have frequent visits with APRN Bingham, but no arm or shoulder pain was reported at any subsequent visits. *See* generally Ex. 15.

On March 14, 2022, Ms. White underwent a left shoulder MRI, ordered by Dr. Delcore, which revealed a partial thickness intrasubstance tear of the distal posterior supraspinatus, but an otherwise normal rotator cuff, an intact labrum, an intact biceps long head tendon, and normal hyaline cartilage. Ex. 14 at 3-4.

Ms. White saw Dr. Delcore on March 30, 2022, this time for complaints of *bilateral* shoulder pain. Ex. 12 at 12. She reported injuring her right shoulder "around 6-7 years ago when she was walking a dog" and had recently experienced worsening right shoulder pain. *Id*. Upon examination, Petitioner had full range of motion, but with pain and positive Hawkins and Neer's signs in both shoulders. *Id*. at 13. Dr. Delcore diagnosed Ms. White with impingement syndrome in both shoulders and recommended left shoulder surgery. *Id*.

On April 29, 2022, Ms. White underwent arthroscopic left shoulder surgery, consisting of acromioplasty, decompression, and distal clavicle resection. Ex. 12 at 4. Dr. Delcore found that Petitioner's left rotator cuff was completely intact. *Id*.

A follow-up visit with Dr. Delcore on May 11, 2022, is the last record filed reflecting left shoulder treatment. Ex. 12 at 10. Ms. White reported that she was performing her shoulder exercises, and she denied any other problems or concerns. *Id*. On examination, Ms. White still had painful and decreased ROM on the left, but her incision was noted to be healing well. *Id*. The plan was for Petitioner to begin formal physical therapy in a month. *Id*.

Ms. White submitted two affidavits in support of her claim. Exs. 7, 24. Exs. 2, 13-18. Petitioner stated that although she had once complained of pain in her neck and upper shoulders, the pain and discomfort she experienced in her left shoulder after the flu vaccine was completely different from any pain she had prior. Ex. 7 at 1. The pain after receiving the vaccine affected her entire arm and limited her range of motion, which she had not had an issue with before. *Id*.

Further, Ms. White stated in her supplemental affidavit that although she mentioned her shoulder pain to her primary care provider at her appointments in November and December of 2020, these complaints were not noted in the medical records. Petitioner stated she had pain in her left shoulder immediately after receiving the vaccine. She believes these complaints were not included in her medical record in these visits as these visits were specifically to discuss Petitioner's management of her PTSD. Ex. 24 at 1.

### III.    Legal Standards

Before compensation can be awarded under the Vaccine Act, a petitioner must demonstrate, by a preponderance of evidence, all matters required under Section 11(c)(1), including the factual circumstances surrounding her claim. Section 13(a)(1)(A). In making this determination, the special master or court should consider the record as a whole. Section 13(a)(1). Petitioner's allegations must be supported by medical records or by medical opinion. *Id.*

To resolve factual issues, the special master must weigh the evidence presented, which may include contemporaneous medical records and testimony. *See Burns v. Sec'y of Health & Human Servs.,* 3 F.3d 415, 417 (Fed. Cir. 1993) (explaining that a special master must decide what weight to give evidence including oral testimony and contemporaneous medical records). Contemporaneous medical records are presumed to

be accurate. *See Cucuras v. Sec'y of Health & Human Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993). To overcome the presumptive accuracy of medical records testimony, a petitioner may present testimony which is "consistent, clear, cogent, and compelling." *Sanchez v. Sec'y of Health & Human Servs.,* No. 11–685V, 2013 WL 1880825, at *3 (Fed. Cl. Spec. Mstr. Apr. 10, 2013) (citing *Blutstein v. Sec'y of Health & Human Servs.,* No. 90–2808V, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998)).

In addition to requirements concerning the vaccination received, the duration and severity of petitioner's injury, and the lack of other award or settlement,[3] a petitioner must establish that she suffered an injury meeting the Table criteria, in which case causation is presumed, or an injury shown to be caused-in-fact by the vaccination she received. Section 11(c)(1)(C).

The most recent version of the Table, which can be found at 42 C.F.R. § 100.3, identifies the vaccines covered under the Program, the corresponding injuries, and the time period in which the particular injuries must occur after vaccination. Section 14(a). Pursuant to the Vaccine Injury Table, a SIRVA is compensable if it manifests within 48 hours of the administration of a flu vaccine. 42 C.F.R. § 100.3(a)(XIV)(B). The criteria establishing a SIRVA under the accompanying QAI are as follows:

> Shoulder injury related to vaccine administration (SIRVA). SIRVA manifests as shoulder pain and limited range of motion occurring after the administration of a vaccine intended for intramuscular administration in the upper arm. These symptoms are thought to occur as a result of unintended injection of vaccine antigen or trauma from the needle into and around the underlying bursa of the shoulder resulting in an inflammatory reaction. SIRVA is caused by an injury to the musculoskeletal structures of the shoulder (e.g. tendons, ligaments, bursae, etc.). SIRVA is not a neurological injury and abnormalities on neurological examination or nerve conduction studies (NCS) and/or electromyographic (EMG) studies would not support SIRVA as a diagnosis (even if the condition causing the neurological abnormality is not known). A vaccine recipient shall be considered to have suffered SIRVA if such recipient manifests all of the following:
>
> (i) No history of pain, inflammation or dysfunction of the affected shoulder prior to intramuscular vaccine administration that would explain the alleged

---

[3] In summary, a petitioner must establish that she received a vaccine covered by the Program, administered either in the United States and its territories or in another geographical area but qualifying for a limited exception; suffered the residual effects of her injury for more than six months, died from her injury, or underwent a surgical intervention during an inpatient hospitalization; and has not filed a civil suit or collected an award or settlement for her injury. *See* § 11(c)(1)(A)(B)(D)(E).

8

signs, symptoms, examination findings, and/or diagnostic studies occurring after vaccine injection;

(ii) Pain occurs within the specified time frame;

(iii) Pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered; and

(iv) No other condition or abnormality is present that would explain the patient's symptoms (e.g. NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, or any other neuropathy).

42 C.F.R. § 100.3(c)(10).

## IV.     Ruling on Entitlement

Respondent has contested entitlement, arguing that Petitioner has not demonstrated that she suffered the residual effects of her injury for more than six months. Opp. at 11. In addition, Respondent has argued that Petitioner has not met the Table requirements for a SIRVA injury and thus, her claim should be dismissed.

### a.  Six Month Severity Requirement

To be eligible for compensation, the Vaccine Act requires a petitioner to have "suffered the residual effects or complications of such illness, disability, injury, or condition for more than six months after the administration of the vaccine." 42 U.S.C. § 300aa-11(c)(1)(D)(i). The severity requirement is a mandatory prerequisite and must be proven by preponderant evidence.[4] *See* 42 U.S.C. § 300aa13(a)(1)(A).

To satisfy this requirement, Ms. White must show that she experienced the symptoms of her injury from onset on November 17, 2020, through May 17, 2021. Respondent has argued that on May 7, 2021, Ms. White saw FNP Horton, just shy of six months after vaccination, and at that visit reported that her shoulder pain was slowly improving. Opp. at 12, *citing* Ex. 3 at 92. Respondent also notes that Petitioner did not receive any treatment for her left shoulder during this visit. *Id.* She thereafter delayed additional shoulder treatment until more than eight months later, on January 24, 2022, when she saw Dr. Delcore. *Id.*, *citing* Ex. 6 at 3. Respondent discounts Petitioner's June

---

[4] In the alternative, a petitioner may meet the requirements of 42 U.S.C. § 300aa-11(c)(1)(D) if evidence establishes that an individual "died from the administration of the vaccine" or "suffered such illness, disability, injury, or condition from the vaccine which resulted in inpatient hospitalization and surgical intervention. *See* 42 U.S.C. § 300aa-(c)(1)(D)(ii), (iii).

9, 2021 chiropractic visit, where Ms. White mistakenly indicated on a diagram that she had *right* shoulder pain. *Id.*, *citing* Ex. 10 at 8. Ms. White stated in her affidavit that she had circled her right shoulder in error when she meant to circle her left shoulder. Respondent seems to argue that because Ms. White had some pain in her neck and upper right shoulder prior to the subject vaccination, she did not make an error. Opp. at 12.

The record preponderates in favor of a finding of severity. First, there is no indication in Respondent's Rule 4(c) report, or in his responsive brief, that Ms. White had any left shoulder symptoms prior to vaccination. Moreover, Ms. White consistently treated her left shoulder symptoms through May 7, 2021, as Respondent admits. And at this May visit, Ms. White *did* receive treatment for her right shoulder despite Respondent's statement to the contrary. Respondent states in his brief that "[u]pon exam, petitioner demonstrated full range of motion in her left shoulder" (emphasis added). Opp. at 8. At most, her left shoulder pain was now "slowly improving" – not fully resolved. Ex. 3 at 92. FNP Horton advised Ms. White to continue exercising her left shoulder at home. *Id.* From this note alone, it is clear that Petitioner's left shoulder symptoms had not likely resolved as of May 7th, or even in the next 10 days.

There is admittedly a subsequent lengthy gap in medical treatment for Petitioner's left shoulder, from June 2021 to January 2022, with the latter record possibly unsupportive of a right-side SIRA. But I credit Petitioner's statement that she circled the wrong shoulder on her Patient Intake Form, and it is otherwise clear from the objective evidence that Ms. White had ongoing left shoulder symptomology at this time. While Ms. White seems to have a complicated medical history and was being treating for many other unrelated symptoms during the seven-month treatment gap for her left shoulder, there is not preponderant evidence showing that her left shoulder symptoms likely resolved during this time.

### b. SIRVA Table Claim Objections

#### i. Onset

Respondent next argues that there is not preponderant evidence to show that Petitioner experienced shoulder pain within 48 hours of vaccine administration. Opp. at 14. Respondent argued that Petitioner presented for medical care for other unrelated complaints on six occasions between her vaccination on November 17, 2020, and her first report of left shoulder pain on December 16, 2020. *See* Ex. 4 at 63, 68, 72; Ex. 22 at 28, 31, 34. Respondent states that "[d]es[ite ample opportunities, petitioner did not report left shoulder pain at any of these visits." Opp. at 14.

10

This argument is unpersuasive. First, claimants cannot be expected to report shoulder pain to specialist treaters, like a gynecologist, or other similar medical provider. As I have mentioned in many other rulings and decisions, a petitioner's failure to mention shoulder pain at appointments for unrelated medical conditions does not necessarily undermine onset. *Page v. Sec'y of Health & Hum. Servs.,* No. 23-1626V, 2025 WL 3141888, at *5 (Fed. Cl. Oct. 3, 2025). Respondent's suggestion that Petitioner should have complained about left shoulder pain during appointments for unrelated conditions is unconvincing.

Second, Petitioner reported her shoulder pain approximately 30 days after vaccination. This is a very reasonable time in which to wait before seeing a medical provider to report what could prove to be a transient condition. Indeed, as seen in other cases, reporting pain sooner often leads to a medical provider asking the patient to wait some time to see if the pain subsides, as it is not uncommon for there to be shoulder pain present after vaccination.

Respondent has also argued that Petitioner did not associate her left shoulder pain with vaccination when she was first seen for her shoulder pain. Opp. at 14. But it is not a requirement in either the statute or the QAI that Petitioner must associate her shoulder pain with vaccination when she first seen for treatment, so long as the totality of evidence eventually does so – as here. Thus, I find that Petitioner has met the 48-hour onset requirement.

ii.  Range of Motion

Respondent next argues that Ms. White is unable to preponderantly demonstrate that she suffered a limited range of motion. 42 C.F.R. § 100.3(c)(10)(ii) (requiring reduced range of motion be limited to the arm in which the vaccination is administered). To support this argument, Respondent states that "[t]hroughout the records, petitioner's objective physical examinations consistently document full ROM." Opp. at 17. However, there are also a number of citations in the record suggesting the existence of a reduced range of motion. *See,* e.g., Ex. 11 at 4 (Petitioner reported increasing pain in her left shoulder and difficulty raising her arm above shoulder height); Ex. 13 at 14 (PT record states "left shoulder abduction presents with pain [and] muscle weakness"). Ms. White would only need to cite to one reference of reduced range of motion to satisfy this QAI requirement. In addition, Ms. White underwent an MRI which showed a partial thickness intrasubstance tear of the distal posterior supraspinatus in her left shoulder, and she underwent left shoulder surgery. It is highly unlikely that surgery would have been recommended unless Petitioner had some obvious reduction in her range of motion.

c. *Other Requirements*

Even if a petitioner has satisfied the requirements of a Table injury or established causation-in-fact, he or she must also provide preponderant evidence of the additional requirements of Section 11(c), *i.e.,* receipt of a covered vaccine, residual effects of injury lasting six months, etc. *See generally* § 11(c)(1)(A)(B)(D)(E). But those elements are established or undisputed. Thus, based upon all of the above, Petitioner has met the elements for a SIRVA and is entitled to compensation.

## Conclusion

Based on my consideration of the complete record as a whole and for the reasons discussed in my ruling, **I find that Petitioner is entitled to compensation. A separate damages order will be issued.**

**IT IS SO ORDERED.**

**s/Brian H. Corcoran**
Brian H. Corcoran
Chief Special Master

12